## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| SMC HOLDINGS, LLC, VINCO, INC., RENEWTECH, LLC, and STEVE ANDERSON, | Civil No. 15-490 (JRT/LIB) |
| Plaintiffs / Counter Defendants, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| AARON A.J. MCCANN and SWITCHINGGEARS, LLC, | |
| Defendants / Counter Claimants. | |

Curtis D. Smith, **MOSS & BARNETT, PA**, 150 South Fifth Street, Suite 1200, Minneapolis, MN 55402, for plaintiffs / counter defendants.

Brooks F. Poley and Matthew C. Robinson, **WINTHROP & WEINSTINE, PA**, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402, for defendants / counter claimants.

This action stems from a failed business venture related to wind energy developments with Native American tribes. Plaintiffs brought this action seeking to recover their $2.7 million investment and other expenses, bringing claims based on common-law fraud, securities fraud, unjust enrichment, conversion, civil theft, and breach of contract. Defendants counterclaimed for breach of a joint venture agreement, breach of fiduciary duties, breach of the duty of loyalty, and negligence.

Defendants move for summary judgment on all of Plaintiffs' claims except for the breach of contract claim. The Court will grant in part and deny in part Defendants' motion for summary judgment, finding insufficient support for some of Plaintiffs' fraud

claims and Plaintiffs' securities fraud claim. Additionally, because the Court does not find the testimony of Plaintiffs' expert so factually unsupported as to warrant exclusion at this time, the Court will deny Defendants' motion to exclude the expert's testimony.

Plaintiffs move for summary judgment on Defendants' counterclaims and for affirmative summary judgment on Plaintiffs' claim for breach of contract. The Court will grant Plaintiffs' motion with regard to Defendants' negligence counterclaim, but, because questions of material fact remain over whether the parties entered into a joint venture or partnership and whether Defendants breached the Convertible Loan Agreement, the Court will deny Plaintiffs' motion in all other respects. The Court will also deny Plaintiffs' motion to strike Defendants' reply declaration because it was responsive to Plaintiffs' arguments in opposition that were not reasonably anticipated.

## BACKGROUND

### I. THE PARTIES

Defendant Aaron McCann is the owner and sole member of Defendant SwitchingGears, LLC ("SwitchingGears"). (Decl. of Aaron McCann in Supp. ("McCann Decl.") ¶ 1, Dec. 1, 2016, Docket No. 77.) McCann describes SwitchingGears as "a wind energy developer that specializes in the development of wind turbine installments for Native American tribes." (*Id.* ¶ 2.) According to McCann, SwitchingGears began developing relationships with Native American tribes in the Midwest, including the Oglala Sioux Tribe in Pine Ridge, South Dakota, starting in 2009. (*Id.* ¶¶ 3-4.) SwitchingGears worked "to develop a project model that would allow [it] to expand the

traditional target market for multiple wind turbine installments in rural and non-taxable communities, such as Native American Tribes." (*Id.* ¶ 5.) Pursuant to SwitchingGears' financial model, it sought to "aggregate wind projects and finance them through a series of investors; federal, state and local investment tax credits; grants; programs; and other financing sources that were uniquely available, collectively, to these communities." (*Id.*)

Plaintiffs include related companies, SMC Holdings, LLC ("SMC Holdings"), Vinco, Inc. ("Vinco"), Renewtech, LLC ("Renewtech"), as well as Steve Anderson (the president of Vinco and a member of SMC Holdings and Renewtech). (*See* Second Am. Compl. ¶¶ 2-5, Jan. 27, 2016, Docket No. 44; Decl. of Steve Anderson ("Anderson Decl.") ¶ 1, Dec. 1, 2016, Docket No. 64.) Vinco is a telecom and electrical contractor, and Renewtech is a wind turbine manufacturer and installer. (Decl. of Matthew C. Robinson in Supp. ("Robinson Decl."), Ex. C at 6:25-7:1, 10:20-11:15, Dec. 1, 2016, Docket No. 76.) Non-party Steve Martineau worked for Vinco and was McCann's principal contact with Plaintiffs during the relevant period. (McCann Decl. ¶ 7; Robinson Decl., Ex. C at 6:21-22.)

The contemplated roles of the parties in the failed wind energy business venture were as follows. SwitchingGears was the project developer or sponsor responsible for arranging financing. (Decl. of Curtis D. Smith in Supp. ("Smith Decl."), Ex. 3 ("McCann Dep.") at 78:18-79:21, Dec. 1, 2016, Docket No. 65; McCann Decl. ¶ 6.) Renewtech was

to be the manufacturer.[1]    (McCann Decl. ¶ 6.)    Vinco would contribute in the

"engineering, procurement, and construction role."   (*Id.*)   There is some dispute over

SMC Holdings' precise role, but the parties agree that SMC Holdings was going to be an

investor in the project.   (*See id.*; Anderson Decl. ¶¶ 6-7.)

## II.    THE PINE RIDGE PROJECT

In early August 2012, SwitchingGears (through a wholly-owned subsidiary,

TREC-REDA, LLC) entered into a Joint Development Agreement and a Power Purchase

Agreement with the Renewable Energy Development Authority ("REDA") of the Oglala

Sioux Tribe, in anticipation of what will be referred to as the "Pine Ridge Project."

(Robinson Decl., Exs. D, E; McCann Decl. ¶ 8.)   McCann contends that he initially

contemplated the Pine Ridge Project would include more than fifty wind turbines with a

project value of approximately $45 million.   (McCann Decl. ¶ 10; Robinson Decl., Ex. F

at 1.)[2]

Defendants chose US Bancorp Community Development Corporation ("US

Bank") as an investor for the project; negotiations with US Bank resulted in a nonbinding

term sheet (the "US Bank Term Sheet"), executed on February 13, 2013.   (Robinson

Decl., Ex. F; McCann Decl. ¶¶ 11-12.)   Under the plan contemplated in the US Bank

Term Sheet, US Bank would contribute approximately $16,875,000 towards the project.

---

[1] There is some dispute over whether Renewtech was going to be the manufacturer, (*see* Pls.' Mem. in Opp'n at 4-5, Dec. 22, 2016, Docket No. 85; *see also* Robinson Decl., Ex. I; Lowell Dep. at 32:4-8; Robinson Decl., Ex. G; Smith Decl., Ex. 5 at 64:17-24), but the Court does not find the disagreement relevant to this motion.

[2] All record citations use internal pagination rather than CM/ECF pagination.

(Robinson Decl., Ex. F at 3.) The US Bank Term Sheet provided several conditions for its investments. (*Id.* at 6-7; Smith Decl., Ex. 6 ("Lowell Dep.") at 79:8-80:24.) One requirement was that SwitchingGears provide US Bank a guaranty against recapture of investment tax credits. (Robinson Decl., Ex. F at 13.) According to McCann, SwitchingGears had to demonstrate sufficient financial strength to support the guaranty. (McCann Decl. ¶ 12.) SwitchingGears deposited $100,000 with US Bank as required by the US Bank Term Sheet on February 15, 2013. (Robinson Decl., Ex. F at 16; McCann Decl. ¶ 12.)

SwitchingGears' primary contact at US Bank, Tracey Gunn Lowell, testified that US Bank never advanced any money to SwitchingGears or held money on deposit in relation to the Pine Ridge Project. (Lowell Dep. at 32:24-33:12; McCann Decl. ¶ 11.) But, on March 4, 2013, McCann told Martineau in a text message that US Bank had "put $1.6[ million] in escrow." (Decl. of Steve Anderson in Opp'n ("Second Anderson Decl."), Ex. E, Dec. 22, 2016, Docket No. 82; *see also id.*, Ex. E-1; Decl. of Curtis D. Smith in Opp'n ("Second Smith Decl."), Ex. O ("Martineau Dep.") at 99:14-100:18, Dec. 22, 2016, Docket No. 83.)

On June 4, 2013, US Bank notified SwitchingGears that it "ha[d] decided not to pursue the [Pine Ridge Project] opportunity at this time." (Robinson Decl., Ex. H.) US Bank stated that it "remain[ed] committed to the intent and purpose of the project and . . . would like to revisit the project with [SwitchingGears] once [its] plans and models [were] more concrete." (*Id.*) The letter stated that SwitchingGears' $100,000 deposit was applied to outstanding consulting fees. (*Id.*) The letter ended with the following:

> While we are terminating this specific term sheet, we respect the relationship we have developed and would like to explore future opportunities with you.  But we would appreciate your written confirmation and agreement that we are no longer negotiating the proposed investment in the Pine Ridge "small-wind" turbines described in our February 14th term sheet, that we have withdrawn our proposed terms, and that you have no further rights, and we have no remaining obligations, arising out of that term sheet, the proposed investment or our potential participation in the project.

(*Id.*)

Lowell testified that US Bank withdrew from the Pine Ridge Project because the valuation did not support SwitchingGears' proposed model and because US Bank could not get a tax opinion based on available information in a timely manner.  (Lowell Dep. at 54:1-13.)  Specifically, US Bank's preliminary internal valuation estimated a total value of around $12.5 million, rather than the $45 million SwitchingGears estimated.  (*Id.* at 58:1-61:13.)  Lowell stated that she and McCann spoke the day before she sent McCann the letter, to make clear to McCann that US Bank was withdrawing, in part because the Pine Ridge Project was not ready to move forward, and to state that if it became "more concrete [the parties] could talk again."  (*Id.* at 55:1-22.)

Lowell testified that she did not have further substantive communication with McCann aside from receiving an email from him in either late 2015 or early 2016 and a cordial note at some point; Lowell did not consider either of these communications to be attempts to reengage US Bank.  (*Id.* at 56:21-57:17.)  Lowell testified that, on December 27, 2013, US Bank was no longer involved in looking at the Pine Ridge Project.  (*Id.* at 62:19-63:21.)

According to McCann, he continued to communicate with Lowell and he "believed that US Bank was still a viable possible investor for the [Pine Ridge] Project in the future if [they] worked towards positioning [them]selves to better satisfy US Bank's proposed requirements, terms and conditions as set forth in the US Bank Term Sheet." (McCann Decl. ¶¶ 14.)

## III.    SMC HOLDINGS' INVOLVEMENT

McCann contends that, after US Bank withdrew its proposal, he sought other investors and he and Anderson agreed that SMC would be an investor in the Pine Ridge Project. (McCann Decl. ¶ 15.) According to Anderson, McCann stated that in order for US Bank to participate in the Pine Ridge Project, SwitchingGears or another party had to "agree to guaranty against any recapture of the federal tax credits associated with the [Pine Ridge] Project, and demonstrate the financial ability to satisfy the guaranty." (Anderson Decl. ¶ 4.) Anderson contends that McCann suggested Vinco act as the guarantor, but Anderson rejected the idea because he did not want to expose Vinco to the guaranty; McCann then told Anderson "that if one of the Plaintiffs would make an equity investment in [SwitchingGears], it could pay off a mortgage loan it owed to Lincoln Savings Bank on [7Flags], thereby allowing [SwitchingGears] to demonstrate sufficient financial strength to satisfy [US Bank's] guaranty requirement without Vinco having to also sign as a guarantor." (*Id.* ¶ 5.)

As a result, SMC Holdings transferred $1.5 million to SwitchingGears on December 30, 2013, and made a second payment of $1.2 million around February 27,

2014. (Martineau Dep. at 61:22-63:21; Anderson Decl. ¶ 6.) The parties dispute the purpose of these transfers. Anderson contends that he thought this "investment was the last step needed to close the deal with [US Bank]." (Anderson Decl. ¶ 6.) Plaintiffs also contend that these transfers were earnest money that McCann would hold in escrow pending a final agreement and that the funds would be spent only for limited purposes with Anderson's express consent. (*Id.*; Martineau Dep. at 66:16-71:10.)

McCann testified that SMC Holdings' payments were equity contributions to SwitchingGears. (McCann Dep. at 99:9-101:12, 110:1-113:19.) According to McCann, the parties contemplated that SMC Holdings would receive either 49% or 51% interest in SwitchingGears. (*Id.* at 99:9-101:12.)

According to Anderson, Defendants used the $2.7 million provided by SMC Holdings to pay Defendants' creditors, "including the purchase of a personal condominium in Hawaii, and motorhome and other personal expenses," without getting Anderson's approval. (Anderson Decl. ¶ 8.)

IV. **THE TERM SHEET**

Defendants and SMC Holdings executed a Term Sheet, dated just after the first transfer, but not signed until the time of the second transfer in February 2014. (Robinson Decl., Ex. I; Martineau Dep. at 61:22-63:21; McCann Decl. ¶ 16; *see also* Robinson Decl., Exs. Q, R.) The Term Sheet contemplated a deal under which SMC Holdings would contribute $2.7 million in exchange for a membership interest in SwitchingGears; SMC Holdings would transfer $1.5 million for SwitchingGears to hold "as earnest money

pending the negotiation and execution of the definitive agreements," and after the agreements were executed, the funds – along with another $1.2 million – would be released to SwitchingGears for several specific purposes detailed in the Term Sheet. (Robinson Decl., Ex. I at 1.) The Term Sheet stated that SwitchingGears could use SMC Holdings' contribution to pay off SwitchingGears' mortgage on a particular property (referred to elsewhere as the 7Flags property), ordinary and reasonable operational expenses, and other approved payments. (*Id.*) The Term Sheet stated that the parties would "negotiate in good faith with a view towards entering into one or more definitive agreements" and that the Term Sheet itself was generally nonbinding. (Robinson Decl., Ex. I at 4.)

The parties continued to negotiate, but they never reached an agreement on the essential terms or executed definitive agreements. (*See* Second Anderson Decl. ¶ 23; Robinson Decl., Ex. J at 53:17-54:2.) Plaintiffs acknowledged in interrogatory responses that they never purchased ownership interest in SwitchingGears. (Robinson Decl., Ex. O at 2.)

McCann and Anderson did execute a separate contract, called the "Convertible Loan Agreement," on October 23, 2013. (Smith Decl., Ex. 4; Second Am. Compl. ¶ 43.) Under the agreement, Anderson loaned McCann $370,000 and interest, in return for a previous advance of that sum. (Smith Decl., Ex 4 ¶ 1.) McCann did not repay the loan by the stated date, April 1, 2014, and Anderson contends that he never exercised his option to accept an interest in another company, Scarab Investments, LLC, in lieu of repayment. (Anderson Decl. ¶ 10.)

## V. TERMINATION OF THE PINE RIDGE PROJECT

The Oglala Sioux Tribe terminated the project with SwitchingGears on October 8, 2014, stating that they had "not seen any progress that [would] give[ them] confidence in moving forward with SwitchingGears." (Robinson Decl., Ex. K.)

Defendants assert that Plaintiffs intentionally caused the tribe to terminate the Pine Ridge Project in order to take the opportunity for themselves. Defendants rely on a text message Martineau sent the day after the cancellation, in which he stated, "Barth had the tribe fire [SwitchingGears] yesterday." (Robinson Decl., Ex. S.) Plaintiffs subsequently hired the subject of the text message, Barth Robinson, and the recipient of the text message, Dave Loney. (Robinson Decl., Ex. N at 2-3; *id.*, Ex. O at 6.)

Martineau admitted that the Oglala Sioux Tribe approached Renewtech about replacing SwitchingGears on the Pine Ridge Project, and that they were told it was "not possible until SwitchingGears ha[d] been terminated." (Martineau Dep. at 90:6-15.) Martineau stated that at the time "[n]othing was going anywhere" and "SwitchingGears hadn't put the . . . project together." (*Id.* at 90:16-19.)

## ANALYSIS

## I. MOTION TO STRIKE

As a preliminary issue, the Court will address Plaintiffs' motion to strike the declaration Defendants provided along with their reply brief. (Second Decl. of Matthew C. Robinson in Supp. ("Third Robinson Decl."), Jan. 5, 2017, Docket No. 92.) Plaintiffs

argue that the filing is not permitted by local rule and contains facts that Defendants should have included in their initial filing instead.

"Reply affidavits are appropriate only when necessary to address factual claims of the responding party that were not reasonably anticipated." Advisory Notes to Local Rule 7.1(b)(2). While some of these documents are not particularly important to the Court's analysis, the Court finds them responsive to Plaintiffs' arguments in opposition that were not reasonably anticipated. Exhibits 1 through 3 relate to REDA's agreements with McCann, which are responsive to Plaintiffs' new contention that McCann made fraudulent statements about a land lease and Bureau of Indian Affairs ("BIA") approval. Exhibits 4 and 5 involve Plaintiffs' contacts with US Bank and are responsive to Plaintiffs' opposition because Plaintiffs submitted affidavits in which both Martineau and Anderson stated that they were unaware US Bank had withdrawn from the US Bank Term Sheet until they learned as much through this litigation. Exhibits 6 through 10 relate to Nathan Ante and are responsive to Plaintiffs' assertions that McCann knew about Ante's second mortgage on the 7Flags property. Because these documents satisfy Local Rule 7.1 requirements, the Court will deny Plaintiffs' motion to strike.

## II.     MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for

either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "When the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

## A.    DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants move for summary judgment on the following claims: common law fraud (Count I), securities fraud (Count II), unjust enrichment (Count IV), conversion (Count V), and civil theft (Count VI). The Court will address each claim below.

### 1.    Fraud Claim

Defendants argue that Plaintiffs' fraud claim (Count I) fails. Under Minnesota law, a fraud claim requires a showing that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.

*Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1071 (D. Minn. 2013) (quoting *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)). Plaintiffs base their fraud

claim on five representations. (Second Am. Compl. ¶ 22.) Defendants argue that none of these representations support a fraud claim.

### i.    Contracts with Oglala Sioux Tribe

First, Plaintiffs allege that McCann falsely stated that SwitchingGears "had an enforceable contract with the Oglala Sioux Tribe to construct, supply, operate and sell power generated from a wind farm." (*Id.* ¶ 22a.) Plaintiffs contend that McCann made this representation in several emails and messages, in August 2012, January 2013, March 2013, and July 2013. (*Id.* ¶ 12.)

Defendants argue that Plaintiffs have not provided any evidence suggesting these statements were false. Defendants have provided the Joint Development Agreement and Power Purchase Agreement with the Oglala Sioux Tribe, and those agreements were entered into before the alleged misrepresentations occurred. (Robinson Decl., Exs. D, E.)

In response, Plaintiffs argue that Defendants read the complained-of conduct too narrowly, and state – apparently for the first time – that they are basing the claim on Defendants' representation that they had lease agreements with the Oglala Sioux Tribe and that the BIA signed off on those agreements. But, Plaintiffs did not mention this basis for their claim in their complaint. Under Fed. R. Civ. P. 9(b), parties must plead the circumstances supporting fraud claims with particularity. One purpose of this requirement is to "ensure[] that a defendant is given sufficient notice of the allegations against him [or her] to permit the preparation of an effective defense." *Parnes v.*

*Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997) (quoting *Weisburgh v. St. Jude Med., Inc.*, 158 F.R.D. 638, 642 (D. Minn. 1994)).

Plaintiffs' new, specific allegations that Defendants made false statements regarding lease agreements and BIA approval were not mentioned in the complaint or raised previously; accordingly, the Court will not consider those allegations here. Plaintiffs must provide evidence related to their allegation that Defendants misrepresented the existence of "an enforceable contract . . . to construct, supply, operate and sell power generated from a wind farm to be located on tribal land," and why the Joint Development Agreement and Power Purchase Agreement do not satisfy the representation. (Second Am. Compl. ¶ 22a.)

When asked about this claim, Martineau suggested Defendants' representation was false because the entity that entered into the agreements on behalf of the tribe may not have had authority to do so, rendering the agreements unenforceable. (Martineau Dep. at 94:20-98:2.) Martineau agreed that this was his sole basis for asserting the statements were false. (*Id.* at 97:24-98:2.) But, even if this authority was lacking, there is no indication McCann knew about it; McCann states that he believed the agreements were enforceable and that he would not have wasted his time negotiating and entering into agreements that he knew were not binding. (McCann Decl. ¶ 9.)

Plaintiffs also argue that the agreements were unenforceable and McCann knew they were unenforceable because they were signed by a non-existent entity, "TREC-REDA, LLC." (*See* Second Smith Decl., Ex. B.) However, even if TREC-REDA, LLC was not formed at the time of the contract, that does not necessarily render the contract

unenforceable or show that McCann knew the contracts were unenforceable. *See, e.g.,* Williston on Contracts § 35:71 ("Contracts are frequently made by promoters on behalf of corporations they expect to organize."); *see also Kilstofte Assocs., Inc. v. Wayzata Bayview Ltd. P'ship*, No. C2-93-856, 1994 WL 11254, at *2 (Minn. Ct. App. Jan. 18, 1994) ("A promoter enters a contract for the purpose of promoting and organizing an unformed corporation and acts on its behalf.")

Overall, the Court finds insufficient evidence to establish a fact question over whether Defendants misrepresented that they entered into an enforceable contract to construct, supply, operate, and sell power from a wind farm with the Oglala Sioux Tribe. The Court will grant Defendants' motion with regard to this basis for Plaintiffs' fraud claim.

### ii. McCann was Sole Member of SwitchingGears

Second, Plaintiffs base their fraud claim on McCann's statement that "he was the sole member and owner of [SwitchingGears]." (Second Am. Compl. ¶¶ 17, 22b.) Plaintiffs allege McCann made this statement "orally on numerous occasions, including, but not limited to, in November and December 2013." (*Id.* ¶ 17.)

Defendants argue that this allegation does not support a fraud claim because Plaintiffs knew that McCann was not the sole member and owner of SwitchingGears before paying any funds to SwitchingGears, and thus, the alleged misrepresentation did not cause Plaintiffs to advance those funds. Defendants point to an email from October 24, 2013, in which Plaintiffs' counsel acknowledged that James McCann (McCann's

father) was noted as the sole member of SwitchingGears on the operating agreement, (Robinson Decl., Ex. T at 2), and Martineau's admission that he knew about James McCann, (Martineau Dep. at 106:20-107:5).

Plaintiffs admit that they were aware of the interest held by McCann's father, but state that their claim is based on the alleged interest Nathan Ante had in SwitchingGears and the 7Flags property, which Defendants failed to disclose. (*See* Second Smith Decl., Exs. C-E.) But as discussed above, Plaintiffs are limited by the claims they pleaded in their complaint, especially in light of the fact that they must plead fraud claims with particularity. Accordingly, Plaintiffs alleged only that McCann misrepresented that he was the sole member of SwitchingGears; Plaintiffs could not have relied upon this representation because they knew it was false. The Court will therefore grant Defendants' motion on this basis for Plaintiffs' fraud claim.

### iii. Statements Regarding US Bank's Involvement in the Pine Ridge Project

Next, Plaintiffs rely on the alleged misrepresentation "[t]hat US Bank had agreed to invest in the Pine Ridge [P]roject if Plaintiffs purchased a membership interest in [SwitchingGears]." (Second Am. Compl. ¶ 22c.) More specifically, Plaintiffs alleged that McCann stated in a November 26, 2012, email and in the Term Sheet that US Bank would contribute "$16,875,000, subject to [SwitchingGears] and/or Vinco providing a guaranty in the event of a recapture. . . and demonstrating the financial ability to satisfy the guaranty." (*Id.* ¶ 14.) Plaintiffs alleged that this representation was false because

"US Bank had not agreed to invest in the Pine Ridge [P]roject conditioned only on increasing [SwitchingGears'] net worth." (*Id.* ¶ 24c.)

Defendants argue that this claim fails because Plaintiffs do not provide any evidence that McCann represented that increasing SwitchingGears' net worth was the **sole** condition for US Bank's investment and that any representation that it was **a** precondition for the investment was not false.

Plaintiffs point to McCann's false statement that US Bank had placed $1.6 million in escrow for the Pine Ridge Project. (Second Anderson Decl., Exs. E, E-1.) Both Anderson and Martineau state that McCann represented to them that Plaintiffs' investment was "the last item necessary for [US Bank] to make a firm commitment to invest in excess of $16,000,000 in the [Pine Ridge] Project." (Second Anderson Decl. ¶ 12; Decl. of Steve Martineau in Opp'n ("Martineau Decl.") ¶ 12, Dec. 22, 2016, Docket No. 81.) Plaintiffs also point to documentary evidence in which McCann pushed the idea that investment in SwitchingGears sufficient to support the guaranty was the last step to US Bank's investment. (*See* Anderson Decl., Ex. D (email showing that in response to Anderson's question regarding what items they needed to satisfy US Bank, McCann focused on the guaranty funding); *id.*, Ex. G (McCann stating "US Bank is ready to go, but wants to verify the Guarantee and complete Deloitte consulting and tax engagement"); *id.*, Ex. H (email from November 2013 stating "my reason for this sudden push is US Bank has the[ir] internal tax credit conference next week, so it will fast track us to loan committee due to good timing"); *id.*, Ex. I (McCann on December 27, 2013, discussing a "list of items US Bank wants to see paid off").)

McCann denies that he ever said that the guaranty was the sole requirement for US Bank's investment and contends that Plaintiffs were aware that there were other requirements. (McCann Decl. ¶ 12.) Along with their reply brief, Defendants provided some emails suggesting that Plaintiffs were aware of the US Bank Term Sheet's requirements and that US Bank had terminated the US Bank Term Sheet. (Third Robinson Decl., Ex. 4 (McCann and Anderson emailing regarding "reengag[ing]" with US Bank among other things and stating Anderson and Lowell spoke on the phone in September 2013).) This appears in conflict with Anderson's and Martineau's declarations that McCann never told Plaintiffs that US Bank withdrew from the US Bank Term Sheet. (Second Anderson Decl. ¶ 14; Martineau Decl. ¶ 13.) This also appears to conflict with Lowell's testimony that she did not have conversations with McCann after the termination letter. (Lowell Dep. at 52:21-63:21.)

Considering this conflicting evidence, the Court finds questions of material fact remain over the falsity of McCann's representations regarding US Bank's involvement in the Pine Ridge Project and the extent to which Plaintiffs relied on those statements. Accordingly, the Court will deny Defendants' motion on this claim.

### iv. Mortgage was the Only Encumbrance on 7Flags Property

Plaintiffs also rely on the alleged false representation "[t]hat the only encumbrance on 7F[lags]'s property was a mortgage to Lincoln Savings Bank with an outstanding balance owed of approximately $1,057,000." (Second Am. Compl. ¶ 22d.) Plaintiffs

contend that this statement was false because "at least one other mortgage, in the amount of $800,000, existed as well as other debt." (*Id.* ¶ 24d.)

Defendants contend this claim fails because McCann did not know about this second mortgage. McCann asserts that he was unaware that Ante "fraudulently executed a mortgage on the property in the approximate amount of $1 million without [his] knowledge or authorization." (McCann Decl. ¶ 19.) In response, Plaintiffs provide a declaration from Ante stating that he had advised McCann that he wished to file a second mortgage and that McCann gave him permission to do so. (Decl. of Nate Ante in Opp'n ("Ante Decl.") ¶ 3, Dec. 22, 2016, Docket No. 80.) The documentary evidence provided by the parties does not resolve the dispute. It shows only that McCann or SwitchingGears owed Ante money at the time, (*see* Ante Decl., Exs. B, C), and that Ante admitted he did not have written authorization to execute the mortgage, (Third Robinson Decl., Ex. 8 at 2).

Overall, based on this conflicting testimony and evidence, the Court finds questions of material fact remain over whether McCann knew about the second mortgage on the 7Flag property and therefore the Court will deny Defendants' motion on this claim.

### v. Statements Regarding Use of SMC Holdings' Funds

Finally, Plaintiffs rely on the alleged misrepresentation that the $2.7 million advance "would be placed in an escrow account that only Anderson and McCann had signing authority on, and that none of these funds would be spent or transferred without

the express consent of Anderson." (Second Am. Compl. ¶ 22e.) Plaintiffs contend this was false because the funds were not placed in an escrow account, used to pay the 7F mortgage, or used on expenses for the Pine Ridge Project. (*Id.* ¶ 24e.)

Defendants first argue that Plaintiffs could not have relied on the statements in the Term Sheet in making their first payment because the Term Sheet was not executed until months after the first payment. But the Court finds the Term Sheet is still evidence of the parties' discussions and supports the idea that such representations were made before the first payment as well. (*See* Second Anderson Decl. ¶ 21.) Plaintiffs also do not solely base this claim on the Term Sheet. Plaintiffs provide testimony from Anderson and Martineau stating that McCann told them the funds would be held in escrow pending final agreement. (Martineau Decl. ¶¶ 14-16; Second Anderson Decl. ¶¶ 16-22; Martineau Dep. at 66:16-67:6.) Plaintiffs also rely on some supporting documentary evidence. For example, on November 12, 2013, McCann emailed Anderson stating that an account was opened at Lincoln Savings Bank with both McCann and Anderson as signers and that the money could be "held there as the lawyers do their thing with formations and legal documents." (Second Anderson Decl., Ex. H.) In the meantime, the email stated, the funds would help show US Bank that SwitchingGears could support a guaranty because it would reflect as a SwitchingGears account. (*Id.*)

Other documentary evidence does not clearly support either side. McCann discussed creating an account titled "escrow" with additional signers; but, in those emails, McCann still discussed using the funds to pay off the mortgage on the 7Flags property in January. (Second Smith Decl., Exs. H, I.) It appears an account titled

"SwitchingGears Escrow" was opened, but did not receive any large deposits and did not have Anderson as a signer.  (*Id.*, Ex. K.)  The funds are reflected on SwitchingGears' general ledger, (*id.*, Ex. F at SWG000046; *Id.*, Ex. G at SWG000072), but it is not clear whether that also means that it was not deposited in the "escrow" account, which McCann's email suggests also would have been a SwitchingGears' account.

Additionally, Defendants note that Plaintiffs could not identify a particular date or time for these representations.  (*See* Martineau Dep. at 66:16-77:1.)  Defendants also point out that there is evidence Martineau knew that some of the initial $1.5 million was being used prior to the second transfer.  (Robinson Decl., Ex. AA (Martineau asking McCann if the SMC Holdings' contribution went into the escrow account, but also stating, "[i]s the full amount in or if I remember right you or [Anderson] told me that some had been put to work already").)

Considering the evidence in the light most favorable to Plaintiffs, the Court finds questions of material fact remain over whether Defendants falsely represented that they would place Plaintiffs' funds in an escrow account with Anderson as a signer, pending final agreement.  The Court will therefore deny Defendants' motion on this claim.

### 2.    Securities Fraud Claim

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for securities fraud under the Minnesota Securities Act (the "Act") (Count II) because Plaintiffs do not qualify as "purchasers" under the Act.  The civil liability provision of the Act provides:

> A person is **liable to the purchaser** if the person sells a security in violation of section 80A.49 or, by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, the purchaser not knowing the untruth or omission and the seller not sustaining the burden of proof that the seller did not know and in the exercise of reasonable care, could not have known of the untruth or omission.

Minn. Stat. § 80A.76(b) (emphasis added).

Plaintiffs admitted in interrogatories that they did not "purchase or otherwise obtain[] any securities of, or ownership interest in, SwitchingGears." (Robinson Decl., Ex. O at 2.) Plaintiffs do not now argue that they ever purchased a security; instead, they argue that the Court should broadly construe "purchaser" to include offerees of securities. Plaintiffs also note that the general fraud provision of the Act covers fraudulent actions made "in connection with the **offer**, sale, or purchase of a security." § 80A.68 (emphasis added). Plaintiffs contend that it would be incongruous for the legislature to provide for criminal liability for fraudulent statements in connection with offers of securities while not providing a civil remedy.

The parties did not provide, and the Court did not find, any Minnesota case interpreting the term "purchaser" in § 80A.76(b). The Court finds that the civil liability provision's use of the word "purchaser" in contrast with fraud provision's broader language suggests that civil liability extends only to actual purchases. This reading is also supported by the fact that the only civil remedy available under the Act is the actual damages resulting from the sale: A purchaser may "recover the consideration paid for the security, less the amount of any income received on the security . . . or for actual

damages as provided in paragraph (3)." § 80A.76(b)(1). And actual damages include "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it" as well as interest, costs, and attorneys' fees. § 80A.76(b)(3). Thus, it is not clear what damages would be available for an aborted sale.

Moreover, courts have reached the same conclusion regarding other states' securities fraud provisions. Two courts found no remedy under the Utah Uniform Securities Act for an incomplete sale of a security because the potential buyer was not a "purchaser." *Levitz v. Warrington*, 877 P.2d 1245, 1247 (Utah Ct. App. 1994); *see also IOSTAR Corp. v. Stuart*, No. 07-133, 2009 WL 270037, at *11 (D. Utah Feb. 3, 2009) ("Potential purchasers do not have a cause of action [under the Utah Uniform Securities Act].") Two courts reached the same conclusion interpreting the Washington Securities Act. *See Interlake Porsche & Audi, Inc. v. Bucholz*, 728 P.2d 597, 606 (Wash. Ct. App. 1986) (finding the Washington statute "limit[ed] civil actions . . . to persons injured by the actual purchase or sale of a security in violation of the statute"); *see also Wealth by Health, Inc. v. Ericson*, No. 09-1444, 2011 WL 1214176, at *4 (W.D. Wash. Mar. 29, 2011).

Plaintiffs do not assert that they purchased a security interest, and therefore, they are not "purchasers" entitled to bring a claim under the Act. The Court will therefore grant Defendants' motion on Plaintiffs' securities fraud claim.

### 3.     Unjust Enrichment, Conversion, and Civil Theft Claims

Defendants argue that Plaintiffs' unjust enrichment, conversion, and civil theft claims all fail because they are based on the same alleged fraudulent misrepresentations discussed above.  All of these claims require a finding that Defendants' retention of the funds was unjust, improper, or unlawful in some way.  *See Cobb v. PayLease LLC*, 34 F. Supp. 3d 976, 988 (D. Minn. 2014) (stating that "conversion is 'an act of willful interference with personal property, done without lawful justification'" (quoting *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997))); *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001) (stating that unjust enrichment requires retention of a benefit in a manner that is unjust, fraudulent, illegal, or otherwise demonstrates moral wrongdoing); Minn. Stat. § 604.14 (civil liability for theft requires stealing property from another).

Defendants contend that because no questions of material fact remain over the alleged fraudulent misrepresentations, there are also no remaining questions of material fact over whether Defendants' retention of the funds was unjust, improper, or unlawful. Because the Court denies Defendants' motion with regard to several of the fraud claims, it will also reject their argument that Plaintiffs' unjust enrichment, conversion, and civil theft claims fail on that basis.

## B.     PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs move for summary judgment on Defendants' counterclaims and for affirmative summary judgment on Count III of their complaint, in which they seek to recover $370,000, plus interest, for breach of the Convertible Loan Agreement.

### 1.     Defendants' Counterclaims Based on Joint Venture

Plaintiffs argue that Defendants' counterclaims fail because they are all premised on the allegation that SwitchingGears and Plaintiffs entered into a joint venture or partnership.  Defendants' counterclaims include the following:  breach of the joint venture agreement (Count I), negligence based on the duty of care owed by joint-venturers or partners (Count II), breach of fiduciary duty based on the duties owed by joint-venturers or partners (Count III), and breach of the duty of loyalty based on the duties owed by joint-venturers or partners (Count IV).  Accordingly, if the Court finds – construing the facts in the light most favorable to Defendants – that the parties did not establish a joint venture or partnership, all of Defendants' counterclaims fail.

Defendants acknowledge that the parties never executed a written joint venture agreement, but allege that SwitchingGears and Plaintiffs entered into "an implied joint venture agreement . . . based on the parties' clear actions, communications and intent." (Answer & Countcls. at 21, Feb. 9, 2016, Docket No. 45.)  The party arguing for the existence of a joint venture bears the burden of proof, *Beehner v. Cragun Corp.*, 636 N.W.2d 821, 832 (Minn. Ct. App. 2001), and must establish the following four elements:

> (1) each party must make a contribution of money, property, time, or skill to the enterprise; (2) the parties must have joint proprietorship and control

such that each party has a proprietary interest and the right of mutual control over the enterprise; (3) the parties must have an express or implied agreement to share the profits, but not necessarily the losses, from the enterprise; and (4) the parties must have entered into an express or implied contract.

*Dorsey & Whitney LLP v. Grossman*, 749 N.W.2d 409, 416 (Minn. Ct. App. 2008).

Plaintiffs argue that Defendants cannot meet elements two through four.

### i.    Joint Control

Plaintiffs frame the second prong of the test as requiring that the parties had joint control over each other's businesses, citing *Powell v. Trans Global Tours, Inc.*, 594 N.W.2d 252, 256 (Minn. Ct. App. 1999), and *Dorsey & Whitney LLP*, 749 N.W.2d at 416. But those cases stated the test as requiring a "right of mutual control over the **subject matter of the property engaged in the venture**," *Powell*, 594 N.W.2d at 256 (emphasis added), and that "each party has a proprietary interest and the right of mutual control over **the enterprise**," *Dorsey & Whitney LLP*, 749 N.W.2d at 416 (emphasis added).  As applied in those cases, the test turned on whether one party had control over the other, rather than mutual right of control over a third entity or shared project, primarily because there was no joint enterprise that the parties were controlling.

In *Powell*, the court found no joint venture between a tour operator and a hotel because there was no evidence that the tour operator "had any control or direction of the means the hotel used to accommodate guests" or that "the hotel had any control or direction of the means [the tour operator] used to arrange tours." *Powell*, 594 N.W.2d at 256.  Essentially, the parties had different roles and no control over each other's roles.  In

*Dorsey & Whitney LLP*, the court found an attorney fee arrangement between a patent owner and a law firm did not amount to a joint venture because the firm did not have control over the client's business. 749 N.W.2d at 416-17 (finding insufficient evidence of joint control where the influence did not extend "beyond the scope of the attorney-client relationship"). In both cases there was no true "joint enterprise" asserted.

Here, Defendants assert there was a joint enterprise between the parties, and thus, they must show a mutual right of control over that joint enterprise – rather than control over each other as member entities. Defendants point to record evidence showing that the parties jointly engaged in the following activities: reviewed fund expenditures, (Decl. of Matthew C. Robinson in Opp'n ("Second Robinson Decl."), Ex. A, Dec. 22, 2016, Docket No. 87); held frequent phone conferences and meetings, (*id.*, Ex. B; Decl. of Aaron McCann in Opp'n ("Second McCann Decl.") ¶ 5, Dec. 22, 2016, Docket No. 86); maintained an electronic management database in order to delegate responsibility to one another, (Second Robinson Decl., Ex. C; Second McCann Decl. ¶ 6); jointly developed, traveled to, and pitched potential clients, (Second Robinson Decl., Ex. D; Second McCann Decl. ¶ 7); sought financing and applied for grants, (Second Robinson Decl., Ex. E; Second McCann Decl. ¶ 8); and retained counsel and consultants, (Second Robinson Decl., Ex. F). The record evidence could support a conclusion that the parties exercised joint control over the Pine Ridge Project, and not that they had distinct and separate roles outside of each other's control.

Accordingly, the Court finds questions of material fact remain over whether the parties had a mutual right of control over a joint enterprise.

### ii. Profit Sharing

Plaintiffs contend that Defendants have not established the profit sharing element for forming a joint venture because McCann admitted the parties never reached a final agreement regarding how to split profits between the parties. (*See* McCann Dep. at 222:11-224:8.) Defendants contend that this testimony only establishes that the parties never reached a final agreement as to how to allocate profits among themselves for the Pine Ridge Project, but they argue that there is clear evidence that the parties generally agreed to share profits and allocate losses with regard to the joint venture as a whole.

The cases Plaintiffs cite suggest that there is insufficient profit sharing "[i]f the amount that one party receives is fixed, regardless of the success or failure of the enterprise." *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 390 (Minn. Ct. App. 2004); *see Meyers v. Postal Fin. Co.*, 287 N.W.2d 614, 618 (Minn. 1979) (finding no profit sharing where one party received fixed payments from the other, but it had no right to share in that party's profits); *Treichel v. Adams*, 158 N.W.2d 263, 266 (Minn. 1968) (finding that payment of a debt by net proceeds does not establish profit sharing for a joint venture).

Additionally, receiving a portion of another party's profits in lieu of a fee for services may not be considered profit sharing for joint venture purposes, at least where there was insufficient evidence of other joint venture requirements. *Ringier Am., Inc. v. Land O'Lakes, Inc.*, 106 F.3d 828, 828-29 (8th Cir. 1997) (finding that while a company "received twenty percent of [the other company's] profits, that was in lieu of part of its

publishing fee, which is not profit sharing 'in [a] manner consistent with a status of joint adventure'" (quoting *Rehnberg v. Minn. Homes*, 52 N.W.2d 454, 457 (Minn. 1952)); *see also Rehnberg*, 52. N.W.2d at 457 (finding no profit sharing where the plaintiff was to share in profits "only for the specific purpose of compensating him as an employe[e]" but also noting "the indispensable element of a contract . . . is also absent"); *Anderson v. ROI Props, Inc.*, Nos. C3-92-2539, C5-93-74, C9-93-76, C0-93-113, 1993 WL 319066, at *4 (Minn. Ct. App. Aug. 24, 1993) (fixing compensation as a percentage of rents received, regardless of net profit, was not profit sharing for a joint venture).

Here, the parties certainly contemplated profit sharing consistent with a joint venture. (*See, e.g.,* Second Robinson Decl., Exs. G, K (emails discussing the joint venture and intent to make profit); Second McCann Decl. ¶ 9 (stating that the parties "each invested a substantial amount of money, time and energy into developing the joint venture and Pine Ridge project" and that "[i]t was fully expected and agreed that profits resulting therefrom would be shared amongst and between the parties").) This record evidence supports a general agreement to share profits for the Pine Ridge Project and other similar projects. In fact, it is difficult to understand the parties' actions, unless there was some agreement to share profits. *See Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F. Supp. 665, 681 (D.N.J. 1985) (finding an agreement to share profits, contrary to the parties' assertions, where the parties' actions

would have "run[] counter to logic" if no such agreement existed).[3]  The facts here show extensive ties between the parties and actions that only make sense if the parties intended to share profits.  Accordingly, the Court finds sufficient evidence regarding the profit-sharing prong.

### iii.     Implied Joint Venture Agreement

Plaintiffs lastly argue that Defendants have not provided evidence of a joint venture agreement.  To establish a joint venture existed, "there must be a contract, whether express or implied, showing that a joint []venture was in fact entered into." *Rehnberg*, 52 N.W.2d at 457.

---

[3] The *Hellenic Lines* court stated:

It runs counter to logic and experience that one would borrow $50,000 at the prime rate plus, and thereupon loan it, interest free, to a pair of individuals one barely knew.  It seems far more likely that that $50,000 – whether viewed as an investment in, or a loan to, the venture – formed part of the basis for a share of the venture's profits.  Also counter to logic and experience is the defendants' contention that, despite their enlarged role in the management and financing of the venture, from the grain purchase through the bagging, [the individual defendants] wanted nothing for their efforts but repayment of their capital contributions.  Far more likely, the enlarged role entailed an enlarged share of the profits.

The court concludes, therefore, that the defendants did agree to share profits, and more broadly, to enter into a joint venture.  If the defendants had been "independent contractors" engaging in separate, interlocking activities, the court does not believe there would have been such a blurring of functions and payments as eventually occurred, or that the parties would have been so incapable of explaining what they had to gain economically from the series of transactions.

611 F. Supp. at 681.

The parties agree that they negotiated about entering into a joint venture agreement. But Plaintiffs argue that the negotiations never concluded and they never entered into a final agreement. McCann and the attorney involved in crafting the joint venture "architecture" both testified that there was never a formal, final agreement. When asked whether a final agreement was ever reached among the parties, the attorney stated "[I]f you mean a final agreement that codified the entire business architecture as we were hoping to do, the answer is no." (Smith Decl., Ex. 1 at 38:14-20.) McCann stated "[t]here was no formal joint venture," that there was no agreement "other than verbal," and that the verbal agreement "would change a lot." (McCann Dep. at 216:20-218:20.) McCann also could not say when any party became a member of the joint venture. (*Id.* at 219:22-220:21.)

But, in determining whether there was a joint venture agreement, the Court may consider "the conduct of the parties to determine whether that conduct demonstrates an implied contract or implied agreement of partnership or joint venture, or some tacit understanding between the parties." *Carlson v. Olson*, 256 N.W.2d 249, 254 (Minn. 1977) (internal citations omitted); *see also McDonald v. Cahlander*, No. A07-1376, 2008 WL 3288766, at *5 (Minn. Ct. App. Aug. 12, 2008) ("Although no written agreement established a joint venture . . ., an implied contract formed through mutual assent or conduct suffices to establish a joint venture."); *Fritz v. Strouth*, No. C3-00-899, 2001 WL 69944, at *4 (Minn. Ct. App. Jan. 30, 2001) (affirming trial court's finding of "a joint venture based on the conduct of the parties in conceiving the project, financing the project, and investing their time, energy, and labor in the renovation").

Here, the parties developed and pitched potential customers together, (Second McCann Decl. ¶ 7; Second Robinson Decl., Ex. D), and the parties sought funding together, (Second McCann Decl. ¶ 8; Second Robinson Decl., Ex. E). Plaintiffs also admit providing $2.7 million dollars to Defendants along with other costs for the Pine Ridge Project. (Second Am. Compl. ¶ 23; Second Robinson Decl., Ex. A.)

Moreover, in contrast to Plaintiffs' reliance on McCann's and Headley's supposed admissions that there was no joint venture agreement, Martineau's testimony suggests the opposite. When asked if he believed the parties were engaged in a joint venture, he stated "A definitive one? No. This one (indicating), yes, in a joint venture for Pine Ridge." (Second Robinson Decl., Ex. U at 91:2-6.) When asked again whether "Vinco, SMC, Renewtech, and SwitchingGears were involved in a Pine Ridge joint venture," Martineau answered affirmatively. (*Id.* at 91:7-10.)

Considering the parties' conduct and conflicting testimony, the Court finds questions of material fact remain over whether the parties entered into an implied joint venture agreement. Accordingly, the Court rejects Plaintiffs' argument that Defendants' counterclaims fail due to the lack of a joint venture.[4] The Court will therefore deny Plaintiffs' motion as to Defendants' claims for which lack of a joint venture was

---

[4] Because the Court finds sufficient evidence regarding a joint venture agreement, the Court need not address whether the parties established a partnership; but the Court notes that the same evidence would suggest the existence of a partnership. *See* Minn. Stat. § 323A.0202(a); *Severson v. Kevin Roche Fin. Servs.*, No. C2-00-1834, 2001 WL 741396, at *3 (Minn. Ct. App. July 3, 2001) (finding a partnership existed where one party did not intend to form a partnership but where the parties agreed to share profits and contribute to expenses).

Plaintiffs' only argument – the breach of contract claim (Count I), breach of fiduciary duty claim (Count III), and breach of duty of loyalty claim (Count IV).

## 2.    Defendants' Negligence Counterclaim (Count II)

Plaintiffs make several additional arguments with regard to Count II of Defendants' counterclaims, in which Defendants allege that Plaintiffs acted negligently and failed to "exercise reasonable care in the performance of their respective duties related to the Joint Venture and Project by failing to meet numerous established deadlines and quality specifications for their tasks."  (Answer & Countercls. at 14-15.)  Plaintiffs contend that they are entitled to summary judgment on this claim because Defendants have failed to identify the standard of care or any specific acts or omissions on which they base their claim.

In response to interrogatories, Defendants stated that the Plaintiffs owed duties based on their status as joint-venturers, co-partners, or co-fiduciaries, and that they beached those duties by "failing to satisfactorily. . . perform their roles and duties under the Joint Venture Agreement as well as by failing to satisfy fiduciary duties owed to Defendants."  (Second Robinson Decl., Ex. L at 6-7.)  Defendants also state more specifically that Renewtech failed to "manufacture, produce or provide upon request . . . new, non-refurbished parts, blades and towers, compliant warranties, part certifications, turbine certifications," and other items, and that SMC Holdings failed to distribute agreed upon funds in several instances.  (Smith Decl., Ex. 10 at 10-12.)

Defendants' claim fails as an improper claim for negligent breach of contract. "A tort is usually defined as a civil wrong independent of a contract," and "[t]he distinction [between the two] is . . . whether a duty has been breached other than one established by contract." *D & A Dev. Co v. Butler*, 357 N.W.2d 156, 158 (Minn. Ct. App. 1984). There is no cause of action for negligently performing a contract. *See Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983). Defendants' claim falls within this description: Defendants point to the roles that Plaintiffs were meant to play in the Pine Ridge Project, (*see* Smith Decl., Ex. 1 at 25:8-27:3), and then allege that they breached their duties by failing to complete them. For example, Defendants alleged in their counterclaims that "SMC fundamentally failed in its crucial role . . . by failing to advance funds in accordance with established timelines necessary to procure requisite tax credits for the [Pine Ridge] Project." (Answer & Countercls. at 12.) The Court will therefore grant Plaintiffs' motion with regard to Defendants' negligence claim (Count II) because it is an improper claim for negligent performance of a contract.

### 3.    Summary Judgment on Count III

Next, Plaintiffs seek affirmative summary judgment on their claim for breach of the Convertible Loan Agreement. McCann and Anderson executed the Convertible Loan Agreement on October 23, 2013. (Second Robinson Decl., Ex. O; Second Am. Compl. ¶ 43.) Under the agreement McCann agreed to pay Anderson $370,000 and interest, in return for a previous advance of that sum. (Second Robinson Decl., Ex. O ¶ 1.) Under the terms of the Convertible Loan Agreement, the balance was due "on or before April

1st, 2014 should the convertible transaction not commence." (*Id.* ¶ 2.) The "convertible transaction" refers to the option that Anderson could opt instead "for the distribution of 51% partnership interest of Scarab Investments LLC in lieu of loan and accrued interest payback." (*Id.* ¶¶ 2-3.)

McCann acknowledged signing the Convertible Loan Agreement and that he did not timely pay the sum to Anderson. (McCann Dep. at 133:22-134:6, 135:15-18.) But, according to McCann, Anderson exercised his right to take ownership of Scarab Investments LLC ("Scarab Investments") in lieu of repayment. (*Id.* at 135:25-136:1, 138:2-17.) McCann testified that Anderson exercised that option around the time they signed the Convertible Loan Agreement. (*Id.* at 138:11-17.) McCann is the sole member of Scarab Investments and its sole asset is another LLC, Jacobs Electric LLC ("Jacobs Electric"). (*Id.* at 138:20-139:20.) McCann stated that he transferred ownership when he "handed [Anderson or Martineau] . . . the corporate books." (*Id.* at 139:21-25, 140:9-16.)

Plaintiffs argue that McCann's testimony does not establish a question of material fact because the factual context makes McCann's version of events implausible and Defendants have not provided persuasive evidence suggesting otherwise. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986) ("[I]f the factual context renders respondents' claim implausible – if the claim is one that simply makes no economic sense – respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary."). Plaintiffs note there is no evidence showing Anderson received ownership of Scarab Investments. Plaintiffs contend that it is implausible that Anderson would have chosen ownership of Scarab

Investments, considering neither Scarab Investments nor Jacobs Electric has ever filed tax returns. (Smith Decl., Ex. 5 at 27:20-28:15.) Additionally, Plaintiffs contend it is unclear why the parties would style the Convertible Loan Agreement as they did if Anderson intended to immediately exercise the option to take ownership of Scarab Investments. (*See* McCann Dep. at 141:5-15.)

However, this claim is not as straightforward as Plaintiffs assert. Defendants provide record evidence suggesting that Plaintiffs were involved with Jacobs Electric. In response to requests for admission, Plaintiffs denied having an ownership interest in Jacobs Electric and Scarab Investments, but admitted taking actions in the name of Jacobs Electric, stating that they did so at the request of Defendants. (Second Robinson Decl., Ex. M at 6.) Minutes for a meeting of Jacobs Electric show that Martineau replaced Ante as registered agent and president of the company. (*Id.*, Ex. N at 1-2.) Martineau also acted on behalf of Jacobs Electric by opening a bank account in Jacobs Electric's name, (*id.*, Ex. P); retaining attorneys and consultants on behalf of Jacobs Electric, (*id.*, Ex. F); paying various expenses on behalf of Jacobs Electric, (*id.*, Ex. A); and using a Jacobs Electric email address, (*id.*, Ex. Q).

Further, Defendants also cite an email from a few weeks before the date of the Convertible Loan Agreement with a subject line "Jacobs Wind Electric Company Transaction," in which McCann proposed selling shares to Anderson in Scarab Investments and another company for $370,000, and McCann discussed one benefit of the transaction as an ownership interest in Jacobs Electric. (*Id.*, Ex. I.) Similarly, Defendants cite another email discussion from a few weeks before the Convertible Loan

Agreement, which sheds light on one reason the parties could have ended up with a less-than-direct plan: it appears they were trying to keep Anderson's name off of SwitchingGears but still give him collateral for an investment in SwitchingGears. (*Id.*, Ex. R.) While Plaintiffs point out that there is no evidence that either of these particular deals occurred, it certainly suggests that the parties were contemplating selling shares in Scarab Investment, describes some reasons why Anderson could consider ownership in Jacobs Electric worth investing, and shows some considerations that may have led to an unusual or circuitous contract.

Based on McCann's testimony and record evidence suggesting the parties were considering selling Anderson an ownership interest in Scarab Investments and showing Plaintiffs obtained some operational control over Jacobs Electric, the Court finds questions of material fact remain over whether Anderson exercised his right to take an ownership interest in Scarab Investments in lieu of repayment. Thus, the Court will deny Plaintiffs' motion with regard to their claim for breach of the Convertible Loan Agreement.

## III.    MOTION TO EXCLUDE EXPERT TESTIMONY

Finally, Defendants move to exclude the expert testimony of Plaintiffs' expert, Richard Marhula. Defendants contend that Marhula's opinions are based on incorrect and speculative assumptions, contradicted by undisputed facts, and not scientific, technical, or based on specialized knowledge.

Plaintiffs intend for Marhula to testify about Defendants' use of the funds Plaintiffs advanced. (Decl. of Matthew C. Robinson ("Fourth Robinson Decl."), Ex. 2 at 1, Dec. 1, 2016, Docket No. 70.) Marhula's testimony is based on SwitchingGears' general ledgers and Marhula's conversations with Anderson and Martineau. (*Id.* at 2.)

Defendants challenge the factual basis for Marhula's opinion, arguing that Marhula relied on the following improper assumptions: (1) the Term Sheet is binding; (2) the Term Sheet was signed in December 2013; and (3) Plaintiffs had to expressly authorize all of McCann's expenditures. Defendants contend that Marhula's reliance on these assumptions renders his opinion "indisputably wrong" or unduly speculative. *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). However, these assumptions are rooted in Plaintiffs' view of the facts. (*See* Martineau Dep. at 78:14-78:24, 66:15-67:6, 115:22-116:15; Second Anderson Decl. ¶¶ 18-23.) The assumptions, therefore, do not render Marhula's opinions "so fundamentally unsupported" that exclusion is warranted, and Defendants' challenge to the factual basis of Marhula's opinions are better left for cross-examination. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

Next, Defendants argue that Marhula's testimony should be excluded because it is not "based on scientific, technical, or other specialized knowledge [that is] useful to the finder of fact in deciding the ultimate issue." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Defendants contend that Marhula's testimony "merely repeats information capable of easy comprehension by a jury" and is therefore "excludable."

*Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1084 (D. Minn. 2015). Marhula's testimony is essentially interpreting the general ledger to testify about how SwitchingGears used SMC Holdings' advance payments (in particular the fact that they did not put the money into escrow). Plaintiffs contend that Marhula's testimony would be helpful to the jury in understanding SwitchingGears' general ledgers and that Marhula's interpretation of the general ledgers is based on his accounting background.

Overall, the Court finds Marhula's testimony is not so fundamentally unsupported to warrant exclusion, and that Marhula's testimony, while not particularly specialized, could be helpful to a jury. Accordingly, the Court will deny Defendants' motion to exclude. However, the Court notes that some of Defendants' concerns go to the usefulness and relevance of Marhula's testimony, and in light of those concerns, the extent of Marhula's eventual testimony may need to be addressed prior to trial.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion for Partial Summary Judgment [Docket No. 73] is **GRANTED in part and DENIED in part** as follows.

    a.    Defendants' Motion is **GRANTED** with regard to Plaintiffs' securities fraud claim and with regard to the fraud claim to the extent that it is based on representations regarding an enforceable contract

with the tribe and McCann being the sole member of SwitchingGears.

    b.     Defendants' Motion is **DENIED** in all other respects.

2.     Defendants' Motion to Exclude Expert Testimony [Docket No. 67] is **DENIED**.

3.     Plaintiffs' Motion for Summary Judgment [Docket No. 61] is **GRANTED in part and DENIED in part** as follows.

    a.     Plaintiffs' Motion is **GRANTED** with regard to Defendants' negligence claim.

    b.     Plaintiffs' Motion is **DENIED** in all other respects.

4.     Plaintiffs' Motion to Strike Pleading [Docket No. 93] is **DENIED**.

DATED:  September 27, 2017          _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                  JOHN R. TUNHEIM
                                       Chief Judge
                           United States District Court